James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

Louis F. Burke
LOUIS F. BURKE PC
460 Park Avenue
New York, NY 10022
Telephone: 212-682-1700

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
KOREIN TILLERY LLC
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

Jamie L. Boyer
Carol L. O'Keefe
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARTHUR H. LAMBORN, JR., on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF NOVA SCOTIA; SCOTIA CAPITAL (USA) INC.; SCOTIA HOLDINGS (US) INC.; THE BANK OF NOVA SCOTIA TRUST COMPANY OF NEW YORK; COREY FLAUM; and JOHN DOES 1-25,<br><br>Defendants. | Civil Action No.<br><br><br><br><br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

## SUMMARY OF ALLEGATIONS

1.      Between approximately January 1, 2008 through July 31, 2016 (the "Class Period"), Defendant Scotiabank[1] and the trader defendants it employed illegally manipulated gold, silver, platinum, and palladium futures and options contracts (collectively "precious metals derivatives") traded on the New York Mercantile Exchange ("NYMEX") and the Commodity Exchange, Inc. ("COMEX") in violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq.* (the "CEA"), and the common law.

2.      Defendants manipulated the prices of precious metals derivatives by "spoofing." Spoofing occurs when a trader places orders for a contract and then quickly removes those orders. Traders engaged in spoofing have no intention of actually executing their orders; instead, they intend to infect the market with false information about supply and demand for the relevant contract in order to create artificial prices to benefit their actual trading activities. Defendants' spoofing created artificial prices that benefitted their own positions at the expense of Plaintiff and the Class.

3.      Scotiabank's unlawful manipulation drew the attention of the U.S. Department of Justice ("DOJ") and the Commodity Futures Trading Commission ("CFTC"). On August 19, 2020, Scotiabank signed a deferred prosecution agreement ("DPA"), in which it agreed not to dispute any facts asserted by the DOJ in the attached statement of facts. In doing so, Scotiabank

---

[1]      In this complaint, Scotiabank refers collectively to the Bank of Nova Scotia, Scotia Capital (USA) Inc., Scotia Holdings (US) Inc., and The Bank of Nova Scotia Trust Company of New York.

acknowledged that its traders spoofed the precious metals derivatives markets thousands of times during the Class Period and agreed to pay $60.4 million in criminal fines.[2]

4.      Additionally, the CFTC ordered Scotiabank to pay $77.4 million in civil penalties and equitable relief—the "largest civil monetary penalty ever ordered in a spoofing case." That figure included a $60.4 million penalty for spoofing and attempted manipulation, and $17 million for making false and misleading statements to the CFTC. The agency had ordered Scotiabank to pay a much smaller penalty just two years earlier, but that smaller figure was based on false statements the company made to the regulator to conceal the breadth of its misconduct. The $77.4 figure more accurately addressed "the true scope and nature of Scotiabank's wrongdoing."[3]

5.      As part of the DPA, Scotiabank agreed that it "shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company" for the conduct described therein, including the allegation that "[b]etween approximately January 2008 and July 2016 … four precious metals traders employed by the Company engaged in fraudulent and manipulative trading practices in connection with the purchase and sale of gold, silver, platinum, and palladium futures contracts."[4]

6.      The CFTC faulted Scotiabank's compliance department for failing to prevent and stop the manipulation. Senior members of Scotiabank's compliance team knew about information concerning the manipulation yet allowed it to continue. CFTC Division of Swap Dealer and

---

[2]      Scotiabank DPA, Attachment A, ¶3.

[3]      *CFTC Orders The Bank of Nova Scotia to Pay Record $77.4 Million for Spoofing and Making False Statements*, CFTC Press Release No. 8221-20 (Aug. 19, 2020), https://www.cftc.gov/PressRoom/PressReleases/8221-20 (title capitalization removed).

[4]      Scotiabank DPA, ¶33, Attachment A, ¶2.

Intermediary Oversight Director Joshua B. Sterling stated that Scotiabank's "compliance and supervision violations highlight the need for all swap dealers to have the right tone at the top—plus appropriate programs and incentives in place—to instill a meaningful culture of compliance among their personnel."[5]

7.      On June 25, 2019, Defendant Flaum ("Flaum") pleaded guilty to attempted price manipulation for actions alleged in this complaint in the U.S. District Court for the Eastern District of New York.[6]  Flaum is currently awaiting sentencing.[7]

8.      Plaintiff transacted in precious metals derivatives throughout the Class Period. Plaintiffs suffered actual losses in these transactions as a result of Defendants' manipulation.

9.      Plaintiff Arthur H. Lamborn, Jr., complains upon knowledge of his own actions and upon information and belief as to all other matters against Defendants Bank of Nova Scotia, Scotia Capital (USA) Inc., Scotia Holdings (US), Inc., The Bank of Nova Scotia Trust Company of New York, Corey Flaum, and John Does 1-25 (collectively, "Defendants"). Given Defendants' efforts to hide their manipulation and the anonymous trading environment for precious metals derivatives, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

---

[5]     *CFTC Orders The Bank of Nova Scotia to Pay $127.4 Million for Spoofing, False Statements, Compliance and Supervision Violations*, CFTC Press Release No. 8220-20 (Aug. 19, 2020), https://www.cftc.gov/PressRoom/PressReleases/8220-20.

[6]     *U.S. v. Flaum*, No. 1:19-cr-00338, Information, ECF No. 2 (E.D.N.Y. July 25, 2019) (hereinafter, the "Information").

[7]     *Flaum*, No. 1:19-cr-003338, Minute Order Granting Motion to Continue Sentencing (E.D.N.Y. July 16, 2020).

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the CEA, 7 U.S.C. §25. This Court also has jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

11.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. §§1391(b)-(d) and §22 of the CEA, 7 U.S.C. §25(c). A significant part of the events giving rise to the claims occurred in the District of New Jersey.

12.     Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or of the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged herein.

## PARTIES

### A.     Plaintiff

13.     Plaintiff  Arthur H. Lamborn, Jr. is a citizen of the state of Connecticut. Plaintiff transacted in COMEX Gold Futures, COMEX Silver Futures, and options on those futures contracts throughout the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation. Defendants spoofed the market for precious metals derivatives thousands of times throughout the Class Period, which deprived Plaintiff of the ability to transact in a competitive market that was free of manipulation and caused Plaintiff to pay more to purchase, or receive less to sell, precious metals derivatives. These artificial prices caused Plaintiff to earn lower profits or suffer greater losses in his trading of precious metals derivatives during the Class Period.

**B.      Defendants**

14.      Defendant Bank of Nova Scotia is a Canadian corporation with its headquarters in Toronto, Ontario, Canada. Defendant Bank of Nova Scotia operates in various locations within the United States, including New York and Houston. Defendant Bank of Nova Scotia employed Defendants Flaum and the Does during the Class Period. Defendant Flaum and certain Doe defendants were acting within the scope of their employment with Scotiabank when they executed the manipulative trades that are the subject of this Complaint.[8]

15.      Defendant Scotia Capital (USA) Inc. is a New York corporation and a registered broker and dealer in securities with the U.S. Securities and Exchange Commission, and a member of the Financial Industry Regulatory Authority and New York Stock Exchange, with its principal place of business located at One Liberty Plaza, New York, New York 10006. Scotia Capital (USA) Inc. is a wholly owned subsidiary of Scotia Capital Inc., which is a wholly owned subsidiary of Scotiabank. Scotiabanc Inc. is a Delaware corporation with its principal place of business located at 711 Louisiana Street, Suite 1400, Houston, Texas 77002. Scotiabanc Inc. is a wholly owned subsidiary of Defendant Scotia Holdings (US) Inc.

16.      Defendant Scotia Holdings (US) Inc. is a Delaware corporation with its principal place of business located at 600 Peachtree Street NE, Atlanta, Georgia 30308-2219. Scotia Holdings (US) Inc. is a wholly owned subsidiary of Scotiabank Investments Inc. The sole common shareholder of Scotiabank Investments Inc. is Scotiabank and the sole preferred shareholder is Scotia Ventures Limited, which is a wholly owned subsidiary of Scotiabank.

---

[8]      Scotiabank DPA, Attachment A, ¶13 ("In placing Manipulative Orders, the Subject Traders were acting within the scope of their employment as employees of [Scotiabank] and with the intent, at least in part, to benefit the Company.").

17.    Defendant The Bank of Nova Scotia Trust Company of New York is a trust company regulated by the New York State Department of Financial Services and the Federal Reserve Bank of New York and a subsidiary of Scotia Holdings (USA) Inc., with its principal place of business located at One Liberty Plaza, 165 Broadway, 26th Floor, New York, New York 10006.

18.    Defendants The Bank of Nova Scotia, Scotia Holdings (US) Inc., Scotia Capital (USA) Inc., and The Bank of Nova Scotia Trust Company of New York are collectively referred to herein as "Scotiabank."

19.    Defendant Flaum is a Florida resident. Defendant Flaum was an employee of Defendant Scotiabank in its New York offices from at least May 2010 until approximately August 2016. From his desk in New York, he used the following "Tag50" identifications to place manipulative orders:  BSNCFLAUM, CFLAUM, and CCCFLAUM. The DOJ charged Defendant Flaum with, and Defendant Flaum pled guilty to, one count of attempted price manipulation related to the conduct at issue in this Complaint.[9]

20.    Defendants John Doe Nos. 1-25 are other individuals or entities that participated in the manipulation and unlawful conduct described herein. These defendants may include other financial firms or employees, agents, or affiliates of Defendant Scotiabank, including, but not limited to, the precious metals traders employed by Defendant Scotiabank or one of its affiliates. For example, the DPA names Subject Trader 2 ("ST-2"), Subject Trader 3 ("ST-3"), and Subject Trader 4 ("ST-4").[10]

---

[9]    *See* Information.

[10]    Scotiabank DPA, Attachment A, ¶2.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

21.    **Commodity Futures Contract**. A commodity futures contract is a standardized bilateral agreement for the purchase and sale of a particular commodity at a specified price at a specified time in the future. A commodity is the underlying asset upon which a futures contract is based. The commodity underlying a futures contract can be a physical commodity, *e.g.*, corn or silver, or a financial instrument, *e.g.*, Treasury bills, foreign currencies, or the value of a stock index.

22.    **"Long" and "Short" Futures**. Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a defined point in the future. During the Class Period, precious metals derivatives were predominantly settled through physical delivery, though some instruments settle to cash.

23.    **Offset by Trading**. Futures market participants trading in futures settling through delivery almost always "offset" their contracts before the expiration month when delivery or settlement occurs. By way of example, a purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract. This sale of one contract offsets or liquidates the earlier purchase of another contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

24.    **Options Contract**. An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, precious metals derivatives).

25.    **Call options** confer upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price) and confer upon the seller, or "option writer," the obligation to sell the commodity at the strike price. The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit. The seller (who is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, the trader that is short a call option would prefer the value of the underlying asset decrease.

26.    **Put options** confer upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price, and they confer upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised. The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at an above market price. Conversely, the seller of the put option wants the price of the underlying asset to stay above the strike price so that the seller of the option would not be forced to buy the underlying futures at an above-market price.

### B.    CME, Globex, and Precious Metals Derivatives

27.    Futures contracts are traded on markets designated and regulated by the CFTC. The CME Group Inc. ("CME Group") owns and operates, among other such Designated Contract Markets ("DCMs"), COMEX and NYMEX. During the relevant time period, COMEX and NYMEX were registered DCMs with the CFTC and subject to regulation by that agency, as well as being self-regulated. Thus, COMEX and NYMEX are each a "registered entity" pursuant to §1a(40) of the CEA, 7 U.S.C. §1a(40).

28.    As DCMs pursuant to §5 of the CEA, 7 U.S.C. §7, COMEX and NYMEX specify terms for the futures contracts they list. These terms include the underlying commodity, trading

units, tick size,[11] price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

29.     COMEX and NYMEX allow traders to place orders to buy ("bids") or sell ("offers") precious metals derivatives through Globex, an electronic trading platform using a visible "order book" that displays quantities of anonymous orders (*i.e.*, offers to sell futures contracts and bids to buy futures contracts) at various price points, or "levels."

30.     COMEX Gold Futures Contracts and COMEX Silver Futures Contracts are listed on the COMEX, subject to the rules and regulations of COMEX, including Chapters 112 and 113 of the COMEX Rulebook, and are traded electronically on the CME's Globex platform.

31.     NYMEX Platinum Futures Contracts and NYMEX Palladium Futures Contracts are listed on the NYMEX, subject to the rules and regulations of NYMEX, including Chapters 105 and 106 of the NYMEX Rulebook, and are traded electronically on the CME's Globex platform.

32.     When an order is matched, *i.e.*, when there is a willing buyer and seller for a specified contract at a given price, a transaction occurs and is referred to as "filled" or "executed". At any time before the order is filled, the trader can "cancel" the order. However, if an order is partially filled, only the unfilled portion of the order will be cancelled, and that portion of the order is pulled from the order book.

33.     Order types vary. A "limit order" allows the buyer or seller to define the maximum purchase price for buying, or minimum sale price for selling, a specified contract. If any part of a limit order can be matched, that portion of the order is immediately executed. A limit order remains on the book until it is either executed, cancelled, or expires. Limit orders that remain in the order

---

[11]     The minimum price increment at which a futures contract could trade on COMEX and NYMEX is called a "tick." COMEX and NYMEX set the value of a tick for each contract that they list.

book without expiring, being filled or being cancelled, are sometimes referred to as "resting orders."

34.    An "iceberg" or "iceberg order" is an order used when trading futures contracts on COMEX and NYMEX.  In this type of order, the total amount of the order is divided into a certain pre-set quantity and only that quantity is visible to other market participants. The remainder of the order is not visible to other market participants.  Then, when the visible portion of the order is filled, the same pre-set quantity of the remaining portion automatically becomes visible. This process repeats until the balance of the order is either executed or canceled.

35.    The order book, or "ladder," allows traders to collectively view the quantity of orders and aggregate number of contracts that all traders are actively bidding or offering at a given price level. Only the total numbers of orders and contracts at various price levels are visible.  The number of traders and/or their identities are unknown, which prevents other market participants from determining whether a trader is contemporaneously placing orders on opposite sides of the market, as Defendants did here. The highest price offered by a buyer is referred to as the best-bid or first-bid level. The lowest price offered by a seller is called the best-ask or first-ask level. The bid-ask spread is the difference between these two prices. FIGURE 1 offers an illustrative example of a visible order book.

**FIGURE 1.**



| Price/Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 106.5 | | | 12 | 20 |
| 106 | | | 10 | 50 |
| 105.5 | | | 15 | 25 |
| 105 | | | 8 | 30 |
| 104 | | | 6 | 20 |
| 103.5 | | | 11 | 100 |
| 103 | | | 8 | 50 |
| 102 | | | 3 | 20 |
| 101.5 | | | 5 | 25 |
| 101 | | | 6 | 30 |
| | | | | |
| 99 | 6 | 50 | | |
| 98.5 | 10 | 20 | | |
| 98 | 14 | 100 | | |
| 97.5 | 8 | 25 | | |
| 97 | 6 | 25 | | |
| 96.5 | 12 | 30 | | |
| 95.5 | 4 | 50 | | |
| 95 | 7 | 40 | | |
| 94 | 5 | 20 | | |
| 94.5 | 7 | 15 | | |
| **TOTAL:** | 79 | 375 | 84 | 370 |

The "Tenth Offer Level." The CME's Order Book showed the first ten offer levels.

The "First Offer Level" or "First Ask Level" (*i.e.*, the lowest offer in the order book).

The "Spread" or "Bid/Ask Spread"

The "First Bid Level" (*i.e.*, the highest bid in the order book).

The "Tenth Bid Level." The CME's Order Book showed the first ten bid levels.

36.    Globex bids and offers are matched according to an algorithm known as "FIFO," which stands for first-in, first-out. Under FIFO, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority, so the order placed first trades first, irrespective of the order's size. Iceberg orders are an exception.  For iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue.

**C.    Spoofing**

Spoofing in General

37.    Spoofing is the act of bidding or offering with the intent, at the time the bid or offer is placed, to cancel the bid or offer before execution. These "spoof orders" create a false impression

of supply or demand that moves futures contract prices in a desired direction *vis-à-vis* an order the spoofer actually intends to execute (the "genuine order").

38.    So, for instance, if a trader wants to buy futures contracts at a price below the lowest ask price available in the market, *i.e.*, a price lower than any market participant would be willing to sell, he/she will place a genuine order (often in the form of an iceberg order to reduce any upward pricing pressure), at that below market price and then work to spoof prices lower. To do this, the trader places one or more large spoof orders – orders the trader never intends to execute – to sell a substantial amount of the same contract on the opposite side of the market. The spoof orders are made at a price that is at or above the first-ask level (the lowest-ask price available in the market), meaning that they will not be immediately filled. However, the large spoof orders create the false impression that investors are selling their futures contracts.  This, in turn, causes prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the genuine order. The manipulator cancels the large spoof orders before they get filled.

39.    The DOJ itself noted in its charging information against Scotiabank that spoofing "inject[ed] false and misleading information into the precious metals futures market in order to deceive other market participants into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand. This false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals derivatives at quantities, prices, and times that they otherwise likely would not have traded."[12]

---

[12]    *U.S. v. Bank of Nova Scotia*, No. 3:20-cr-00707, Information, ¶4, ECF No. 1 (D.N.J. Aug. 19, 2020).

40.     Figures 2a and 2b below demonstrate the order book imbalance and artificial supply and demand forces that spoofing causes. Figure 2a is a hypothetical order book. The best bid is two ticks away from the best offer, so no executable trades are present. In this example, the order book begins fairly balanced, with roughly even numbers of contracts being offered and bid. Figure 2b shows how that same order book would appear after being manipulated by spoof trades. Specifically, the order book in Figure 2b shows that an iceberg buy order is placed to buy 50 contracts, but only showing five contracts to the market at a time. Then, spoof orders are placed on the opposite side of the market: one spoof order for 200 contracts is placed at the first-offer level; four spoof orders for a total of 100 contracts are also placed at the first-offer level; and six additional spoof orders for a total of 250 contracts are placed at the second-offer level. As a result of these spoof orders, the order book shows a significant imbalance, appearing to have far more sellers than buyers.  This imbalance signals artificial supply to the market and artificially drives prices downward.

**FIGURE 2a.**

Order Book Before the Spoofing Begins

| Price/Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 25.050 | | | 25 | 185 |
| 25.045 | | | 14 | 100 |
| 25.040 | | | 28 | 150 |
| 25.035 | | | 16 | 201 |
| 25.030 | | | 12 | 144 |
| 25.025 | | | 10 | 100 |
| 25.020 | | | 5 | 112 |
| 25.015 | | | 10 | 206 |
| 25.010 | | | 14 | 120 |
| 25.005 | | | 15 | 386 |
| | | | | |
| 24.095 | 18 | 242 | | |
| 24.090 | 20 | 314 | | |
| 24.085 | 22 | 163 | | |
| 24.080 | 24 | 264 | | |
| 24.075 | 10 | 102 | | |
| 24.070 | 12 | 148 | | |
| 24.065 | 18 | 104 | | |
| 24.060 | 11 | 94 | | |
| 24.055 | 6 | 85 | | |
| 24.050 | 12 | 227 | | |
| **TOTAL**: | 153 | 1743 | 149 | 1704 |

15

**FIGURE 2b.**



Order Book After the Spoofing

| Price/Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 25.050 | | | 25 | 185 |
| 25.045 | | | 14 | 100 |
| 25.040 | | | 28 | 150 |
| 25.035 | | | 16 | 201 |
| 25.030 | | | 12 | 144 |
| 25.025 | | | 10 | 100 |
| 25.020 | | | 5 | 112 |
| 25.015 | | | 10 | 206 |
| 25.010 | | | ~~14~~ 20 | ~~120~~ 370 |
| 25.005 | | | ~~15~~ 20 | ~~386~~ 686 |
| | | | | |
| 24.095 | ~~18~~ 19 | ~~242~~ 247 | | |
| 24.090 | 20 | 314 | | |
| 24.085 | 22 | 163 | | |
| 24.080 | 24 | 264 | | |
| 24.075 | 10 | 102 | | |
| 24.070 | 12 | 148 | | |
| 24.065 | 18 | 104 | | |
| 24.060 | 11 | 94 | | |
| 24.055 | 6 | 85 | | |
| 24.050 | 12 | 227 | | |
| **TOTAL:** | 154 | 1748 | 160 | 2254 |

Six spoof orders to sell a total of 250 contracts are placed at the second offer level.

One spoof order to sell 200 contracts is placed at the first offer level.

An additional four spoof orders to sell a total 100 contracts are placed at the first offer level.

A primary order to buy 50 contracts is placed as an iceberg order. Because this is an iceberg order, the market only sees 1 new order for 5 contracts, reducing upward price pressure that might partially counteract the spoof orders.

41.     The same technique can also be reversed to manipulate prices artificially higher. For example, a trader can place an order to sell futures contracts above the current market prices and then, by entering and canceling large orders to buy that same futures contract, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of their initial sell order.

42.     In either instance, spoofing allows the trader to buy futures contracts at below the current market price, or to sell futures contracts at above the current market price, causing the trader to profit accordingly.

D.    **Defendants Manipulated the Prices of Precious Metals Derivatives and Options Contracts to Artificial Levels Throughout the Class Period**

43.    In the Scotiabank DPA, Defendant Scotiabank admitted Defendant Flaum and three other Scotiabank precious metals traders placed thousands of spoof orders.  Flaum and these traders never intended to execute those orders, which were placed to create false and misleading impressions of increased supply and demand in the market.  Specifically, the spoof orders were placed to (a) induce fellow market participants to trade at times, prices, and quantities they would not have absent Defendants' market manipulation and (b) financially benefit Defendants at the expense of Plaintiff and the Class.

44.    Defendants placed the spoof orders electronically from computers located, at a minimum, at Defendant Scotiabank's offices in New York onto the NYMEX and COMEX. The illegitimate supply and demand signals conveyed by the spoof orders were disseminated to the market and artificially moved prevailing market prices in the direction of Defendants' genuine orders, injuring Plaintiff and Class members. During his plea hearing, Defendant Flaum admitted that the spoof orders were designed to—and did—artificially move the prices of precious metals derivatives.[13]

45.    Defendants' manipulation of the markets for precious metals derivatives caused artificial prices throughout the Class Period. The Scotiabank DPA provided just a handful of examples of the thousands of spoof orders that Defendants placed during the Class Period:

1.    **January 19, 2010**

46.    On or about January 19, 2010, ST-2, in the course of his employment with Defendant Scotiabank, placed a spoof order to buy a total of approximately 110 COMEX Gold

---

[13]    *See Flaum*, No. 1:19-cr-00334, Transcript at 5-6, ECF No. 7 (Dec. 26, 2019).

Futures contracts at a price of $1,133.80.  This spoof order sent false demand signals to the market and was placed so that his genuine order on the sell side of the market would be fulfilled at an artificial price. Three milliseconds after ST-2 placed his spoof buy order, the market price moved and his pre-existing genuine sell order at the price of $1,134.00 was filled. Less than one second later, ST-2 cancelled the spoof orders.  None of the spoof orders were filled.[14]

        **2.      August 22, 2011**

47.    On August 22, 2011, Defendant Flaum, in the course of his employment with Defendant Scotiabank, placed a genuine order to sell 25 COMEX Gold Futures contracts at a price of $1,891.00. Thirteen seconds later, Flaum placed a spoof order to buy 245 COMEX Gold Futures contracts at a price of $1,890.20, sending false demand signals to the market.  The spoof order was designed to fill Flaum's genuine order on the sell side of the market at an artificial price. Less than two seconds after the spoof order was placed, Flaum's genuine order was filled. Less than two seconds after his genuine order was filled, Flaum canceled the spoof orders without any of them being filled.[15]

        **3.      June 28, 2012**

48.    On June 28, 2012, in the course of his employment with Defendant Scotiabank, ST-3 placed a genuine iceberg order to sell three COMEX Gold Futures contracts at a price of $1,569.60. ST-3 then placed a spoof order to buy 150 COMEX Gold Futures contracts at a price of $1,569.00, sending false demand signals to the market in order to fill ST-3's genuine order on the sell side of the market at an artificial price. Twenty-one milliseconds after the spoof order was placed, ST-3's genuine order began to fill, and within one second ST-3's genuine order was fully

---

[14]     Scotiabank DPA, Attachment A, ¶6.

[15]     Scotiabank DPA, Attachment A, ¶10.

executed. Less than three seconds later, ST-3 canceled the spoof orders without any of them being filled.[16]

### 4.    August 1, 2013

49.    On August 1, 2013, ST-4, in the course of his employment with Defendant Scotiabank, placed two genuine iceberg orders to buy a total of 10 COMEX Gold Futures contracts at a price of $1,320.00. Four seconds later, ST-4 began placing a series of contract spoof orders to sell a total of 57 COMEX Gold Futures contracts at a price of $1,320.00, sending false supply signals to the market.  The spoof orders were placed to fill ST-4's genuine order on the buy side of the market at an artificial price. Shortly after the spoof order was placed, ST-4's genuine orders began to fill, and within one second of the spoof order, ST-4's genuine orders were fully executed. Less than 15 seconds after placing them, ST-4 canceled the spoof orders.  None of them were filled.[17]

### 5.    December 31, 2015

50.    On December 31, 2015, Defendant Flaum, in the course of his employment with Defendant Scotiabank, placed a genuine order to sell five COMEX Gold Futures contracts at a price of $1,060.40. Eighty-three seconds later, Flaum placed a spoof order to buy 245 COMEX Gold Futures contracts at a price of $1,059.90, sending false demand signals to the market.  The spoof orders were placed so that Flaum's genuine order on the sell side of the market would be filled at an artificial price. One millisecond after the spoof order was placed, Flaum's genuine

---

[16]    Scotiabank DPA, Attachment A, ¶7.

[17]    Scotiabank DPA, Attachment A, ¶11.

order filled. Less than two seconds later, Flaum canceled the spoof orders without any of them being filled.[18]

### 6.     May 25, 2016

51.     On or about May 25, 2016, Defendant Flaum, in the course of his employment with Defendant Scotiabank, placed a genuine order to buy three COMEX Gold Futures contracts at a price of $1,222.50. Approximately 10 seconds later, Flaum placed a spoof order to sell 145 COMEX Gold Futures contracts at a price of $1,223.20, sending false supply signals to the market in order to fill Flaum's genuine order on the buy side of the market at an artificial price. Seventy-two milliseconds after the spoof order was placed, Flaum's genuine order filled. Less than two seconds after his genuine order was executed, Flaum canceled the spoof orders without any of them being filled.[19]

52.     That same day, Defendant Flaum, in the course of his employment with Defendant Scotiabank, placed a genuine order to buy 10 COMEX Gold Futures contracts at a price of $1,221.70. Approximately six seconds later, Flaum placed a spoof order to sell 145 COMEX Gold Futures contracts at a price of $1,222.20, sending false supply signals to the market.  The spoof order was placed so that Flaum's genuine order on the buy side of the market was filled at an artificial price. One millisecond after the spoof order was placed, Flaum's genuine order filled. As the price continued to fall, Flaum placed another genuine order to buy 10 COMEX Gold Futures contracts at a price of $1,221.40. After his second genuine order was executed, and less than 25 seconds after they were placed, Flaum canceled the spoof orders without any of them being filled.[20]

---

[18]     Scotiabank DPA, Attachment A, ¶5.

[19]     Scotiabank DPA, Attachment A, ¶8.

[20]     Scotiabank DPA, Attachment A, ¶9.

53.     These examples are just a snapshot of Defendants' pervasive spoofing behavior throughout the entire class period, during which Plaintiff and the Class routinely bought and sold Precious Metals Futures.

54.     Defendants' wrongful conduct unlawfully increased their profits at the expense of Plaintiff and the Class. Simply stated, Defendants' manipulation caused innocent market participants trading on NYMEX and COMEX precious metals futures and options contracts to buy and sell at artificial prices, to their detriment and Defendants' gain.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and as representative of the following Class:

> All persons and entities that purchased or sold any NYMEX Platinum Futures contract, NYMEX Palladium Futures contract, COMEX Silver Futures contract, COMEX Gold Futures contract, or any option on those futures contracts, during the period of at least January 1, 2008 through at least July 31, 2016.[21]

56.     Excluded from the Class are Defendants, their officers and directors, management, employees, subsidiaries, or affiliates. Also excluded from the Class is the Judge presiding over this action, his or her law clerks, spouse, any other person within the third degree of relationship living in the Judge's household, the spouse of such person, and the U.S. government.

57.     The Class is so numerous that joinder of the individual members of the proposed Class is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least hundreds, if not thousands, of geographically dispersed Class members transacted in NYMEX Platinum Futures contracts, NYMEX Palladium

---

[21]     Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, or options on those futures contracts throughout the Class Period.

58.     Plaintiff's claims are typical of the claims of the other Class members. Plaintiff and fellow Class members sustained damages arising out of Defendants' common course of conduct in the violations of law, as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws, as alleged herein.

59.     Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class and has no interests that are adverse to the interests of absent Class members. Plaintiff's counsel is competent and experienced in class action litigation, including commodity futures manipulation class action litigation.

60.     Common questions of law or fact exist, as to Plaintiff and all Class members, and these common questions predominate over any questions affecting only individual members of the Class. These predominant questions of law and/or fact common to the Class include, without limitation:

(a)     whether Defendants manipulated the price of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, or the price of options on those futures contracts in violation of the CEA;

(b)     whether Defendants manipulated the price of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, or the price of options on those futures contracts to be artificial;

(c)      whether Defendants' manipulation caused a cognizable injury under the CEA;

(d)      whether Defendants' unlawful conduct caused actual damages to Plaintiff and the Class;

(e)      whether Defendants were unjustly enriched at the expense of Plaintiff and members of the Class;

(f)      the operative time period and extent of Defendants' unlawful conduct; and

(g)      the appropriate nature and measure of Class-wide relief.

61.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not afford to individually litigate claims like those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

62.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

63.    The applicable statutes of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

64. The unlawful activity alleged herein was inherently self-concealing because Defendants' manipulation of the prices of NYMEX and COMEX precious metals derivatives required surreptitious submission and cancelling of trade orders.

65. Defendants concealed their manipulative acts by, *inter alia*, placing orders electronically to buy or sell NYMEX and COMEX precious metals derivatives at a certain price, even though they secretly had no intention of transacting at that level. Defendants never disclosed that these orders were placed solely to manipulate the prices of NYMEX and COMEX precious metals derivatives. Because of this fraudulent concealment, and the fact Defendants' manipulation is inherently self-concealing, Plaintiff and the Class members could not have discovered Defendants' market manipulation any earlier than the date of the public disclosures thereof.

66. Additionally, Defendant Scotiabank repeatedly issued public statements that they maintain established procedures to ensure compliance with all applicable laws and regulations.

67. Further, as discussed herein, the CFTC has confirmed that, in connection with its regulatory investigation and fine in 2018, Defendant Scotiabank made "false statements and omissions" to regulators and it is only now, in 2020, that the true nature and extent of the misconduct was revealed.[22]

68. As a result, Plaintiff and the Class had no knowledge of, and could not have had knowledge of, Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of reasonable diligence before August 19, 2020, when the CFTC Order and Scotiabank DPA were released.

---

[22]    CFTC Order at 2; *see also* Scotiabank DPA, ¶4.b ("As a result of the Company's incomplete disclosure, and inaccurate representations on which the CFTC relied, the CFTC and the Company entered into a resolution that did not reflect the full extent of Flaum's spoofing . . . .").

69.    Upon the public release of such information on August 19, 2020, Plaintiff quickly engaged legal counsel and investigated whether it was affected by Defendants' misconduct during the relevant period and whether it had a legal claim for which to seek redress.

70.    Given Defendants' concealment of its unlawful conduct through misrepresentations, active omissions and/or the inherently self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the applicable statutes of limitations governing Plaintiff's claims were tolled.

71.    For the reasons stated herein, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## FIRST CLAIM FOR RELIEF

**For Manipulation in Violation of the Commodity Exchange Act**
**7 U.S.C. §§1, *et seq.***
**(As Against All Defendants)**

72.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

73.    Defendants through their acts alleged herein, from at least January 1, 2008 through at least July 31, 2016, specifically intended to, and did, cause unlawful and artificial prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts in violation of the CEA, 7 U.S.C. §§1, *et seq.*, through their use of fictitious buy and sell orders, and other manipulative conduct.

74.    Defendants manipulated the price of a commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

75.    During the Class Period, the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures

contracts, and options on those futures contracts did not result from the legitimate market information and the forces of supply and demand. Instead, the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts were artificially inflated, deflated and/or otherwise manipulated by Defendants' spoofing and other wrongful trading activities.

76.    Throughout the Class Period, Defendants entered large buy or sell orders with no intention of executing those orders and every intention of cancelling those orders before they were filled. Defendants purposefully did this to inject illegitimate information about supply and demand into the marketplace and to artificially move prices up or down to suit Defendants' own trades and positions. As a result of these artificial prices, Plaintiff and the Class suffered losses on their trades in NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts.

77.    Through their use of spoofing and other manipulative techniques, Defendants manipulated the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts throughout the Class Period and thereby caused damages to Plaintiff and Class members who purchased or sold such instruments at the artificially inflated or deflated prices.

78.    At all times and in all circumstances previously alleged herein, Defendants had the ability to cause, and did cause, artificial prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts. Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts,

and options on those futures contracts and were aware of the effects of spoofing and other manipulative conduct on those markets.

79.    By their intentional misconduct, Defendants each violated §§6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§9, 13b, 13(a), and 25(a), throughout the Class Period.

80.    As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered damages and injury-in-fact due to the artificial prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts to which Plaintiff and the Class would not have been subject, but for the unlawful conduct of the Defendants, as alleged herein.

81.    Plaintiff and members of the Class are each entitled to actual damages sustained in NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

**For Employing a Manipulative and Deceptive Device in Violation
of the Commodity Exchange Act
7 U.S.C. §§1, *et seq.* and Regulation 180.1(a)
(As Against All Defendants)**

82.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

83.    Defendants' unlawful conduct, as described herein, including the use of systematically submitting and cancelling spoof orders and engaging in other manipulative conduct to artificially move prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts, constitutes the employment of a manipulative and deceptive device.

84.     As alleged herein, Defendants acted intentionally – or, at a minimum, recklessly – in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiff and the Class.

85.     By their intentional misconduct, Defendants each violated §§6(c) and 22(a) of the CEA, 7 U.S.C. §§9 and 25(a), throughout the Class Period.

86.     As a result of Defendants' unlawful conduct, Plaintiff and members of the Class suffered damages and injury-in-fact due to artificial prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts to which Plaintiff and the Class would not have been subject, but for the unlawful conduct of the Defendants, as alleged herein.

87.     Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

## THIRD CLAIM FOR RELIEF

**For Principal-Agent Liability for Violation of the Commodity Exchange Act**
**7 U.S.C. §§1, *et seq.***
**(As Against All Defendants)**

88.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

89.     Defendant Scotiabank is liable under §2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of its agents, representatives, and/or other persons acting for it in the scope of their employment.

90.     Plaintiff and members of the Class are each entitled to damages for the violation alleged herein.

## <u>FOURTH CLAIM FOR RELIEF</u>

**Unjust Enrichment**
**(As Against All Defendants)**

91.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

92.    Defendants financially benefited from their unlawful acts. As alleged herein, Defendants submitted spoof orders electronically and employed other manipulative techniques to improperly influence the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts in an artificial direction. Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions at the expense of Plaintiff and the Class.

93.    These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact at artificial prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts.

94.    Given their wrongful and manipulative conduct, it is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution.

95.    Each Defendant should pay restitution for its own unjust enrichment to Plaintiff and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the requested relief as follows:

A.     For an Order certifying this lawsuit as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), designating Plaintiff as the Class Representative and appointing its counsel as Class Counsel;

B.     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest, at the maximum rate allowable by law;

C.     For a judgment awarding Plaintiff and the Class restitution of any and all sums of Defendants' unjust enrichment;

D.     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

E.     For such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury for all issues so triable.

Dated:  September 22, 2020

By:  /s/ James E. Cecchi
James E. Cecchi
Lindsey H. Taylor
**CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

George A. Zelcs (*pro hac vice forthcoming*)
Randall P. Ewing, Jr. (*pro hac vice forthcoming*)
Ryan Z. Cortazar (*pro hac vice forthcoming*)
**KOREIN TILLERY LLC**
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile:  (312) 641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Jamie L. Boyer (*pro hac vice forthcoming*)
Carol L. O'Keefe (*pro hac vice forthcoming*)
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile:  (314) 241-3525
jboyer@koreintillery.com
cokeefe@koreintillery.com

Louis F. Burke
**LOUIS F. BURKE PC**
460 Park Avenue
New York, NY 10022
Telephone: 212-682-1700
lburke@lfblaw.com

*Attorneys for Plaintiff and the Proposed Class*